UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MICHAEL LESSIN, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 5-171 (RMC) |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INC., and BRETT S. BERNSTEIN, | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION DENYING PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD**

This matter concerns Mr. Lessin's appeal from an arbitration award in his favor in the amount of $32,975. Mr. Lessin asks this Court to vacate the award and remand for rehearing before another arbitration panel. He contends that the arbitrators failed to apply the law properly because they found Defendant, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), liable but only awarded $32,975, a small amount in comparison to Mr. Lessin's losses of over $5 million. Mr. Lessin also contends that the arbitrators improperly excluded critical evidence and failed to record the proceedings. As explained below, the Court finds that the arbitrators did not exceed their powers or disregard the law. The motion to vacate the award will be denied.

**I. BACKGROUND FACTS**

Mr. Lessin opened a brokerage account with Merrill Lynch in early 2000. The account was managed by Merrill Lynch stock broker Brett Bernstein. At the time he opened his

Merrill Lynch account, Mr. Lessin held almost $5.3 million in Yahoo! securities and a $2.1 million margin balance. Within ten months, the account had lost almost 100% of its value. This suit concerns Mr. Lessin's attempt to hold Defendants liable for those losses.

Shortly after attending college, Mr. Lessin worked at Broadcast.com, a distributor of audio and video programs over the Internet. While so employed, he exercised stock options totaling $99,000 in Broadcast.com stock. Defs. Ex. D, Lessin Arbitration Testimony ("Lessin Test.") at 16-10, 26. A few months later, Yahoo! acquired Broadcast.com. *Id*. at 140. Mr. Lessin then opened a brokerage account at Ferris Baker Watts ("FBW") and deposited his Broadcast.com stock into the account. *Id*. at 153, 160-61. Because of Yahoo!'s purchase of Broadcast.com, Mr. Lessin was able to exchange his Broadcast.com shares for Yahoo! shares worth about $2.3 million. *Id*. at 140; Defs. Ex. E, Jones Arbitration Testimony ("Jones Test.") at 333; Defs. Ex. J, FBW Option Agreement.

When he opened his FBW account on June 28, 1999, Mr. Lessin executed a New Account Form. The Form specified that Mr. Lessin's priority investment strategies were speculation and aggressive growth. Defs. Ex. E, Jones Test. at 329-30.[1] The broker responsible for Mr. Lessin's account at FBW was Robert Jones. Mr. Jones testified that although he recommended that Mr. Lessin diversify his account to lessen the risk of the account's decline, Mr. Lessin refused because he wanted to use his Yahoo! stock to trade on margin. *Id*. at 327, 336-37, and 352-53. Over a period of seven months while his account was at FBW, Mr. Lessin made a series of extremely profitable trades. His account grew to approximately $4.9 million by January of 2000. Defs. Ex. E, McCann Arbitration Testimony ("McCann Test.") at 185-186; Defs. Ex. K, FBW Account Statements.

---

[1] Mr. Lessin testified that Mr. Jones completed the New Account Form and that he signed it without understanding it. Defs. Ex. D, Lessin Test. at 156-57.

Mr. Lessin then decided to transfer his FBW account to Merrill Lynch in order to save money on the commissions he was required to pay at FBW. Merrill Lynch charged a flat rate per year instead of a commission on each trade. Defs. Ex. D, Lessin Test. at 68. In mid-January of 2000, Mr. Lessin transferred his account, consisting of $5.3 million in Yahoo! stock and a $2.1 million margin balance, to Merrill Lynch, where his account was managed by Mr. Bernstein. *Id*. at 200-01.

Mr. Bernstein testified that he spoke with Mr. Lessin regarding his strategy for managing the account. Mr. Bernstein stated:

> A:    What we talked about, and one question that Michael [Lessin] asked me was, since we're the same age,[2] how would I invest this money if it were me? And the point I made was that I would put roughly 50 percent of it into tax-free bonds, the lion's share into a managed or an allocated portfolio, and then have some fun with the rest to be marked speculation, and he immediately said that's absurd. He felt Yahoo was a very big blue chip stock . . .
>
> . . .
>
> Q:    Did you tell him how much risk he was taking on with his portfolio?
>
> A:    Well, of course. When we initially got together, I explained the issues I had with the concentration [in Yahoo stock], the issues I had with the level of margin, and what he was using the margin for and the types of stocks he was purchasing.
>
> . . .
>
> It concerned me that he had the concentration. It concerned me with the margin. He and I spoke about this. He was comfortable with it. He had experience doing it. He had experience with options. This is not something that was new to him. And so, since he had experience, and again, as I said, this isn't money he was using to live on, and he had a long-time horizon, he felt comfortable taking this level of risk.

---

[2]Mr. Lessin and Mr. Bernstein were 24 years old at the time.

Defs. Ex. A, Bernstein Arbitration Testimony ("Bernstein Test.") at 134-35, 160, 162-63.

When Mr. Lessin opened his Merrill Lynch account, he executed a Retail Account Profile, which stated that his investment objective was "growth" and that his risk tolerance was "aggressive." Defs. Ex. M, Retail Account Profile. Mr. Lessin also executed an Option Agreement which stated that his objective was "speculation" and that he had five years experience trading equities and options. Defs. Ex. N, Option Agreement. In addition, Mr. Lessin signed a transfer form to transfer his account from FBW to Merrill Lynch. On this form he wrote "DO NOT LIQUIDATE ANYTHING." Defs. Ex. O, Account Transfer Form; Defs. Ex. D, Lessin Test. at 186.

Mr. Bernstein testified that upon transferring the account to Merrill Lynch, Mr. Lessin made aggressive trades in the technology sector by, for example, purchasing over $1.5 million in BEOS, a small company with thinly traded stock. Defs. Ex. A, Bernstein Test. at 221-22, 242-44. Mr. Lessin was reluctant to sell his Yahoo! securities or to pay down his margin account. *Id.* at 210-11. In March of 2000, Mr. Bernstein advised Mr. Lessin to sell some securities to cover a margin call. *Id.*; Defs. Ex. B, Bernstein Test. at 211-15. Mr. Lessin sold shares of Nokia, Ameritrade, E-Spire, and UPS, but did not sell any of his Yahoo! stock. *Id*. In July of 2000, Mr. Bernstein and Mr. Lessin had a dinner meeting. Mr. Bernstein testified that he discussed the risks of Mr. Lessin's concentrated position on margin, but Mr. Lessin did not desire to make any changes to his high risk strategy. Defs. Ex. A, Bernstein Test. at 226-27. Mr. Bernstein recorded notes of this meeting in a computer program called "Gold Mine." Ex. P, Bernstein's Gold Mine Notes 7/4/00 entry. The notes stated, "We went over his [account] and various options he could do. He decided to hold the course and wait for the [market] to rebound." *Id*. Mr. Lessin made it clear that he did not want to sell Yahoo!. Defs. Ex. A, Bernstein Test. at 193, 210-11, 221.

Mr. Lessin was notified of the status of his Merrill Lynch account in a number of ways. He received monthly account statements from Merrill Lynch, as well as written confirmations of each of his securities trades. Defs. Ex. E, Lessin Test. at 115-16. Also, Mr. Lessin required Mr. Bernstein to fax handwritten confirmations of each trade as soon as the trade was executed. Defs. Ex. B, Bernstein Test. at 194-95. He used these confirmations to track his account performance. Defs. Ex. E, Lessin Test. at 24. Mr. Lessin also used Merrill Lynch Online to track his account. Defs. Ex. D, Lessin Test. 211.

Even though he had access to his monthly account statements and he admitted that he used the trade confirmations and online account information to track his account, Mr. Lessin testified that he did not "study these things." *Id*. at 206. He testified that he only did what was recommended by Mr. Bernstein. *Id*. at 201. He alleges that Mr. Bernstein repeatedly reassured him that everything was fine, "sunshine and smiles," *id*. at 204, 208, and that it took him a really long time to realize that "the picture was not as rosy as Merrill Lynch had . . . represented to me." *Id*. at 224-25.

By October 16, 2000, Mr. Lessin's Merrill Lynch account had lost almost 100% of its value. He had lost about $5.6 million, and he liquidated his Merrill Lynch account. Even then, Mr. Lessin still favored Yahoo! stock. Ten days after his Merrill Lynch account was liquidated, on October 26, 2000, Mr. Lessin purchased 90 shares of Yahoo! in an online account with FBR Investment Services. Defs. Ex. Q, Account Statement dated 10/31/00; Defs. Ex. D, Lessin Test. at 223-225. Mr. Lessin testified, "I was under the complete impression that Yahoo! was the stock to own and continue to own." *Id*. at 225.

Mr. Lessin's relationship with the Defendants was governed by a standard brokerage

contract, which provided that disputes between the parties would go to arbitration before a panel of National Association of Securities Dealers ("NASD") arbitrators. *See* Defs. Ex. N, Option Agreement. In February 2003, Mr. Lessin filed a Statement of Claim with NASD Dispute Resolution against Merrill Lynch and Mr. Bernstein, alleging misrepresentation, failure to hedge, unsuitable recommendations, breach of contract, and failure to supervise. Mr. Lessin sought damages between $5 million and $10 million, plus punitive damages, interest, loss of opportunity cost, costs, and attorney fees.

A hearing before a panel of three NASD arbitrators (the "Panel") was held on May 24, 2004, through May 28, 2004, and September 15, 2004. While the parties agreed that Mr. Lessin's losses totaled approximately $5.6 million, Merrill Lynch and Mr. Bernstein disputed their liability for the losses. On October 6, 2004, the arbitrators found Merrill Lynch liable for compensatory damages totaling $32,975. They did not find Mr. Bernstein liable, and they did not award any other damages. The Court infers from this ruling that the Panel found that Merrill Lynch was responsible for failing to oversee Mr. Bernstein, but that Merrill Lynch was not responsible for Mr. Lessin's investment decisions because, contrary to Mr. Bernstein's advice, Mr. Lessin personally insisted on keeping his concentrated holdings in Yahoo! securities and on trading on margin.

Subsequently, Mr. Lessin filed a motion to vacate the arbitration award and for remand for rehearing by a different arbitration panel. He contends that the arbitration award bears no rational relationship to the claims made or the evidence presented, and therefore that it is arbitrary and capricious. Mr. Lessin complains that 1) the Panel did not explain how it arrived at the damage figure of $32,975; 2) the Panel refused to hear the testimony of one of his experts; and 3) the Panel failed to keep a record of the proceedings.

## II.  LEGAL STANDARDS

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1-16, was passed by Congress "to establish an alternative to the complications of litigation." *Revere Copper & Brass v. Overseas Private Inv. Corp.*, 628 F.2d 81, 83 (D.C. Cir. 1980) (*citing Silko v. Swan*, 346 U.S. 427, 431 (1953)).  Judicial review of an arbitration award is narrowly limited.  *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 395-96 (2002); *Revere Copper*, 628 F.2d at 83.  "Allowing undue challenges to arbitration awards would defeat the finality and speedy dispute resolution expected of the arbitration procedure." *Id.* at 83 n.1.  Under section 10 of the FAA, an arbitration award may be vacated where:

> 1) the award was procured by corruption, fraud, or undue means;
>
> 2) the arbitrators were partial or corrupt;
>
> 3) the arbitrators were guilty of misconduct in refusing to postpone the hearing or refusing to hear relevant and material evidence, or for misbehavior that prejudiced the rights of a party; and
>
> 4) the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award was not made.

9 U.S.C. §10.  In addition, in some circuits, including this one, an arbitrator's "manifest disregard of the law" can compel a court to vacate an award.  *LaPrade v. Kidder Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

> Manifest disregard of the law "means more than error or misunderstanding with respect to the law."  Consequently, to modify or vacate an award on this ground, a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.

*Id.* (citations omitted). Errors of fact and errors of law are not sufficient to cause *vacatur* of an arbitration award. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *Teamsters Local Union No. 61 v. UPS*, 272 F.3d 600, 604 (D.C. Cir. 2001).[3] "[I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball v. Garvey,* 532 U.S. 504, 506 (2001). Further, issues of credibility and relevance are for the arbitrators to decide. *Id.* (credibility); *Berlacher v. PaineWebber Inc.*, 759 F. Supp. 21, 24 (D.D.C. 1991) (relevance).

### III. ANALYSIS

**A. Failure to Explain Award**

Relying on *Tripi v. Prudential Securities, Inc.*, 303 F. Supp. 2d 349 (S.D.N.Y. 2003), Mr. Lessin claims that the arbitration award should be vacated because the Panel did not explain how it arrived at the damage figure of $32,975. In *Tripi*, the petitioner's brokerage account fell from $980,000 to $110,000 in 10 months. The arbitration panel awarded him $25,000 and did not explain the award. The district court found that in light of the strong evidence of Prudential's liability, the meager award "shocked the conscience." *Id*. at 356. The court remanded the case for an explanation regarding damages.

Mr. Lessin's reliance on *Tripi* is misplaced. In *Tripi*, the court could not discern any explanation for the award. Here, in contrast, an explanation for the award is readily apparent from

---

[3]The Court recognizes that labor arbitration, drawing its authority from the collective bargaining agreement, and commercial arbitration under the FAA are related, but distinct, legal *fora*. Principles may nonetheless be borrowed from one to the other. *See Revere Copper*, 628 F.2d at 83 n.1.

the record. The Court reasonably can infer, from the arbitration award and the evidence presented to the Panel, that the Panel credited the testimony of Mr. Jones and Mr. Bernstein and concomitantly discredited Mr. Lessin's testimony. The testimony of Mr. Jones and Mr. Bernstein was supported by documentary evidence. For example, both Mssrs. Jones and Bernstein testified that Mr. Lessin's investment strategy was speculation and aggressive growth. Defs. Ex. E, Jones Test. 329-30; Defs. Ex. A, Bernstein Test. at 134-35, 160, 162-63. The FBW and Merrill Lynch new account forms that Mr. Lessin signed reflected this investment strategy. Defs. Ex. E, Jones Test. 329-30; Defs. Ex. D, Lessin Test. 184-186; Defs. Exs. M, Retail Account Profile; N, Option Agreement; & O, Account Transfer Form.

In some instances, Mr. Lessin's testimony supported the testimony of Jones and Bernstein. Mssrs. Jones and Bernstein testified that they counseled Mr. Lessin to diversify his holdings but that Lessin desired to hold his Yahoo! stock. Defs. Ex. E, Jones Test. 327, 336-37, 352-53; Defs. Ex. A, Bernstein Test. at 134-35, 160, 162-63. Even after suffering millions of dollars in losses, Mr. Lessin admitted that he was still convinced that Yahoo! was the stock to own. Defs. Ex. D, Lessin Test. at 225. Shortly after he closed his Merrill Lynch account, he purchased ninety shares of Yahoo! stock. Defs. Ex. Q, FBR Investment Service Account Statement.

The Panel did not find Mr. Bernstein liable for Mr. Lessin's losses. Based on the evidence before them, they found that Mr. Lessin was responsible for his own losses. He wanted to hold his Yahoo! stock without diversifying. Further, Mr. Lessin was aware of the status of his Merrill Lynch account, as he received monthly account statements, written trade confirmations, and faxed handwritten trade confirmations. In addition, he followed his account by using Merrill Lynch Online. He held a concentrated position in Yahoo! stock and he traded on margin. His investment

strategies were speculation and aggressive growth. In sum, Mr. Lessin risked losses to his account, and his account suffered losses as a result.

Moreover, this Circuit specifically has held that a lump-sum award should not be rejected for lack of an explanation.

> We reject the idea that a lump-sum award can be rejected for want of explanation (or, what is in effect almost the same thing, remanded for an explanation) in the absence of facts making it appear probable that the arbitrators committed an error justifying vacation of the award. . . . [F]orcing arbitrators to explain their award even when grounds for it can be gleaned from the record will unjustifiably diminish whatever efficiency the process now achieves.

*Sargent v. Paine Webber Jackson & Curtis, Inc.*, 882 F.2d 529, 532 (D.C. Cir. 1989). Arbitrators are not required to explain the basis for their awards. *Wilko v. Swan*, 346 U.S. 427, 436 (1953). "Arbitrators are not required to disclose the basis upon which their awards are made, and courts will not look behind lump-sum awards in an attempt to analyze the reasoning process of the arbitrators." *Davis Corp. v. Interior Steel Equip. Co.*, No. 87-1321, 1988 WL 123724, at * 2 (D.D.C. Nov. 14, 1988). Courts should not inquire into the basis of a lump-sum arbitration award, unless the facts fail to support it or the arbitrators acted in manifest disregard of the law. *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1179 (D.C. Cir. 1991). If grounds for the decision can be inferred from the facts, the decision should be affirmed. *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 121 (2d Cir. 1991). The facts of this case do not show error; nor is there evidence that the arbitrators disregarded the law. As described above, the grounds for the award can be readily inferred from the record.

Mr. Lessin also argues that there is no explanation for the specific award amount of $32,975. In fact, Defendants point to a logical explanation for an award in this amount. The amount

-10-

represents the $500 nonrefundable filing fee that Mr. Lessin paid when he submitted his claim to arbitration, Pl.'s Motion, Ex. A, Arbitration Award at 2, plus $32,475 for management fees that Mr. Lessin paid to Merrill Lynch.  Pl.'s Motion, Ex. D, Profit and Loss Statement, at 1.  While the Panel did not find Mr. Bernstein liable for Mr. Lessin's losses on his account, it did find that Merrill Lynch had failed to supervise properly Mr. Bernstein.  Requiring Merrill Lynch to disgorge the fees it had been paid was a reasonable remedy.

Mr. Lessin contends that this explanation is erroneous, as the arbitration award provides that the parties shall bear their own fees and costs.  Pl.'s Motion, Ex. A, Arbitration Award at 2.  Even if the arbitrators arrived at their award amount through some other calculation, as explained above, the lack of an explanation for the award is not a ground for *vacatur*.  *Davis*, 1988 WL 123724, at * 2.  The lump-sum award cannot be rejected due to lack of an explanation where the facts do not show that the arbitrators committed an error that would justify vacating the award.  *Sargent*, 882 F.2d at 532.  Thus, the Court will not reject the lump-sum award for lack of an explanation.

### B. Exclusion of Expert Testimony

Mr. Lessin also argues that the Panel erred when it excluded the testimony of his expert, Art Ehaun.  Mr. Bernstein recorded notes in a computer program called "Gold Mine."  For example, his notes regarding the July 2000 dinner meeting with Mr. Lessin indicate, "We went over his [account] and various options he could do.  He decided to hold the course and wait for the [market] to rebound."  Defs. Ex. P, Gold Mine Notes (7/4/00 entry).  Further, notes dated October 11, 2000 stated, "Howard and I had spoken with him numerous times about being so aggressive, especially on margin. [A]lso, we were discussing that he wouldn't take losses on the [stocks] that

were on margin [because] he felt they would come back.  Now he was forced to sell them.  He thought he knew it all." *Id.*, Gold Mine Notes (10/11/00 entry).

Mr. Lessin believed that the Gold Mine notes were fabricated after the fact.  Mr. Lessin hired an expert, Kenneth Bradley, to conduct a forensic examination of Mr. Bernstein's computer hard drive.  Mr. Bradley conducted the examination and testified at the arbitration hearing.  Defendants' expert, Michael Finnie, also examined the hard drive and testified at the arbitration.  The experts agreed that a number of the Gold Mine entries were authentic, including the notes dated July 4, 2000.  However, Mr. Lessin's expert, Mr. Bradley, stated that because some of the hard drive data was compressed, it appeared many of the entries were in fact made at approximately the same time.  Defs. Ex. C, Bradley Test. at 126-29.  Based on this testimony, Mr. Lessin argued that the October 11, 2000 entry and others were back-dated.  However, on cross examination, Mr. Bradley admitted that there was a maintenance function in the Gold Mine program that could explain the compression of entries that was the basis for his opinion that certain entries were back-dated. *Id.* at 166, 210.  Defendants' expert, Mr. Finnie, testified that the maintenance function had been run on the computer hard drive and that it explained the compressed entries.  Defs. Ex. C, Finnie Test. at 245-250.

At the arbitration hearing, Mr. Lessin sought to call Art Ehaun to testify as an expert as well.  Presumably, Mr. Ehaun would have attempted to support the testimony of Mr. Bradley and would have attempted to undermine the testimony of Mr. Finnie.  While it is not clear exactly what testimony Mr. Ehaun had to offer, it is clear that Mr. Ehaun had not examined Mr. Bernstein's computer hard drive.  The Panel declined to hear Mr. Ehaun's testimony, finding that the testimony would be cumulative.  Defs. Ex. D. at 4-5.

An arbitration panel has the discretion to determine which evidence is relevant and which is merely cumulative. *Berlacher*, 759 F. Supp. at 24. "Arbitrators may exclude evidence which is merely cumulative. Indeed, arbitrators must be expected to take actions which will expedite the proceedings." *Cearfoss Constr. Corp. v. Sabre Constr. Corp.*, No. 89-1223, 1989 U.S. Dist. LEXIS 9639, at *12 (D.D.C. Aug. 10, 1989). Here, the Panel appropriately exercised its discretion in excluding the testimony of Mr. Ehaun.

**C. Alleged Failure to Keep a Record**

In his motion to vacate, Mr. Lessin contends that the Panel failed to keep a record of the arbitration proceedings, that approximately one-half of the tapes were "missing, blank, or ruined." Pl.'s Motion to Vacate ¶ 68. This allegation simply is erroneous, as the transcripts of the tapes show that the arbitration hearing was properly recorded. While sometimes one side of a tape was blank, that side merely was not used. Defendants' Opp'n at 36-7.[4]

There is a single one hour portion of the proceedings, not related to issues raised in Mr. Lessin's motion to vacate, that is missing from the tapes. Mr. Lessin has made no showing that this reflects misconduct by the Panel, that it prejudiced the proceedings, or that it precludes judicial review. The failure to record a small portion of testimony in and of itself does not constitute misconduct by an arbitration panel and does not justify vacating an arbitration award. *Moeller v. D.E. Frey & Co., Inc.*, No. 4:03mc7-SPM 2004 U.S. Dist. LEXIS 9860, at *13 (N.D. Fla. May 10, 2004); *Grosso v. Salomon Smith Barney*, No. 03-mc-115, 2003 U.S. Dist. LEXIS 20208, at *20 (E.D. Pa. Oct. 22, 2003).

---

[4] Mr. Lessin does not raise this issue in his reply brief; he may have realized his error.

## IV.  CONCLUSION

The Court finds that the arbitrators did not exceed their powers or disregard the law. The lump-sum award of $32,975 may not be vacated due to a lack of explanation, as the basis of the award can be inferred from the evidence presented to the arbitrators.  In addition, the arbitrators did not err when they excluded of the testimony of Mr. Lessin's expert, Mr. Ehaun, as his testimony was of dubious relevance since he had not examined the computer in question.  Also, his testimony would have been cumulative.  Further, the arbitration proceeding was duly and adequately recorded.  Mr. Lessin's motion to vacate the arbitration award [Dkt. # 1] will be DENIED, the arbitration award will be AFFIRMED, and this case will be DISMISSED.  A separate order accompanies this memorandum opinion.


Date:   March 31, 2006                         _____/s/_____
                                                ROSEMARY M. COLLYER
                                                United States District Judge